# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 19-10

LINDSEY LAMBERT MALBROUGH

VERSUS

ALYCIA RODGERS, M.D., ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2015-1290
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

**********

### ULYSSES GENE THIBODEAUX
### CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and John E. Conery, Judges.

**CONERY, J., dissents and assigns reasons.**

**AFFIRMED AS AMENDED.**

Keith Christian Armstrong
Douglas L. Grundmeyer
Chaffe McCall, L.L.P.
8550 United Plaza Boulevard – #103
Baton Rouge, LA 70809
Telephone: (225) 922-4300
COUNSEL FOR:
    Defendant/Appellant – The Louisiana Patient's Compensation Fund & Oversight Board

Derriel Carlton McCorvey
102 Versailles Boulevard – Suite 620
Lafayette, LA 70502
Telephone: (337) 291-2431
COUNSEL FOR
    Plaintiff/Appellee – Lindsey Malbrough

**Ryan M. Goudelocke**
**Jessica R. Reaux**
**Durio, McGoffin, Stagg & Ackermann**
**P. O. Box 51308**
**Lafayette, LA 70505-1308**
**Telephone:  (337) 233-0300**
**COUNSEL FOR:**
    **Defendants/Appellants - Alycia Rodgers, M.D. and The Pediatric Center**
    **of Southwest Louisiana**

**THIBODEAUX, Chief Judge.**

Plaintiff, Lindsey Lambert Malbrough, individually and on behalf of the estate of her deceased minor son, Anthony Pitre III, filed suit against Dr. Alycia Rodgers, Sulphur Pediatric Clinic, Inc. d/b/a The Pediatric Center of Southwest Louisiana (Center), and their insurer, Louisiana Medical Mutual Insurance Company (collectively Defendants), seeking wrongful death and survival damages for alleged malpractice in their treatment of Anthony. Finding that Dr. Rodgers breached the standard of care and that, consequently, Anthony lost a chance of survival, the trial court in a bench trial awarded Plaintiff damages of $200,000.00 for lost chance of survival, $50,000.00 for loss of enjoyment of life, and $8,569.00 for funeral expenses. Dr. Rodgers and the Center as well as the Louisiana Patient's Compensation Fund and its oversight board (PCF) have appealed the judgment. Finding no manifest error or abuse of discretion, we affirm the trial court's judgment as amended to reflect a single lump sum award of $258,569.00.

I.

**ISSUES**

Defendants raise the following issues for this court's review:

1.  The District Court erred in its award of damages:

    a.  when it awarded damages for both a "lost chance of survival claim" and for a "survival action claim," despite these two theories of recovery compensating for the same injury; and

    b.  when in the absence of evidence suggesting that any chance of survival was lost, it relieved Plaintiff of her burden of showing the value of that lost chance and assigned an entirely arbitrary value to an unqualified percent chance of survival.

2. The District Court erred in its factual conclusions resulting in a finding of liability on the part of appellant Dr. Alycia Rogers:

   a. when it disregarded the opinion of every testifying physician, including Anthony Pitre's treating pediatric oncologist and Plaintiff's own retrained expert in that field, that Anthony did not suffer any reduced chance of survival between August 10 and August 15, 2010; and

   b. when it instead substituted lay opinion, unsupported by any evidence presented at trial, that passage of five days caused some unquantified lost chance of survival, relieving Plaintiff of her burden to demonstrate that lost chance by competent evidence.

The PCF raises three alternative issues:

1. the district court manifestly erred in finding that Plaintiff carried her burden to prove that Defendants proximately caused the decedent to lose a chance of survival.

2. alternatively, the district court abused its discretion and manifestly erred in awarding a speculative and unproven amount of damages for the lost-chance-of-survival claim.

3. further in the alternative, the district court legally erred in awarding survival-action damages and for funeral and burial expenses in addition to the specific sum awarded for the lost-chance-of-survival claim.

II.

**FACTS AND PROCEDURAL HISTORY**

This medical malpractice action arises out of the treatment provided by Dr. Albert Richert, Jr. and Dr. Rodgers to Plaintiff's six-year-old son, Anthony. Dr. Rodgers was Anthony's primary pediatrician, and she treated him at the Center from

2

May 2009 until August 2010 for attention deficit hyperactivity disorder (ADHD) and asthma.

On July 13, 2010, Anthony saw Dr. Richert, a colleague of Dr. Rodgers, at the Center for chest pain and difficulty breathing. Dr. Richert noted that Anthony's chest pain had begun the week before and was located in the anterior mid-chest. It was further noted that these symptoms occurred at night, that the episodes occurred daily, and that the symptoms were described as moderate in severity and worsening. Dr. Richert prescribed asthma medicine and ibuprofen for pain. No additional testing was performed to determine the cause of Anthony's chest pain.

Anthony returned to the Center on August 10, 2010. He was seen by Dr. Rodgers who noted that, in the four weeks prior, Anthony's shortness of breath occurred once or twice a week and that his rescue medication was used three or more times a day. Dr. Rodgers also noted that Anthony's chest pains were due to "growing pains" and that Anthony had had fever, but did not include any duration of the fever. Dr. Rodgers wrote prescriptions for asthma medicine, but there is no record of her ordering any additional tests to determine the cause of Anthony's symptoms.

On August 15, 2010, Anthony was brought to Lake Charles Memorial Hospital Emergency Room with complaints of fever and chest pain, which were reported to have started a month prior. Upon being informed of Anthony's symptoms, the ER physician ordered a chest x-ray, which revealed an increased pleural density in Anthony's chest. This finding prompted the ordering of a CT scan, which revealed that the mass located on Anthony's third rib was presumptively

Ewing sarcoma,[1] a form of bone cancer. Anthony was then transferred to Ochsner Medical Center in New Orleans, Louisiana, where he was admitted on August 16, 2010.

The diagnosis of Ewing sarcoma was confirmed on August 18, 2010. A CT scan performed on August 19, 2010, confirmed Anthony's sarcoma was stage IV.

Anthony's physicians commenced chemotherapy on August 25, 2010. Though his primary tumor initially responded to treatment by decreasing in size, imaging in February and March 2011 showed metastatic lesions in the pelvis, vertebra, and skull. Tragically, Anthony passed away on March 21, 2011.

Plaintiff filed a complaint with the PCF, which convened a Medical Review Panel to review Anthony's care by Dr. Rodgers and the Center. On January 28, 2015, the panel unanimously opined that neither defendant "failed to meet the applicable standard of care as charged in the complaint." Thereafter, Plaintiff filed suit on April 1, 2015.

Prior to trial, the trial court dismissed, with prejudice, all of Plaintiff's claims arising out of care rendered to Anthony prior to July 13, 2010, leaving at issue only Anthony's visit to Dr. Richert on July 13, 2010, and his visit to Dr. Rodgers on August 10, 2010.

In its oral reasons for ruling, the trial court opined that Dr. Richert had not breached the standard of care owed to Anthony on July 13, 2010, and that the

---

[1]Although this sarcoma is referred to interchangeably through out the record as "Ewings" or "Ewing's," we defer to the spelling contained in *Dorland's Illustrated Medical Dictionary* 663 (31st ed. 2007).

Center faced no liability through him.[2]  The court did find liability on the part of Dr.

Rodgers, stemming from Anthony's visit on August 10, 2010, and through her,

vicarious liability of the Center as the latter's employee.  As for damages, the trial

court awarded Plaintiff $200,000.00 for loss chance of survival, reasoning:

> What is the chance of survival for a 6-year-old child valued at.  I know that there was extensive testimony by physicians for the defense that indicate that the chance of survival was no different on August 15th as it was on August 10th.  I refuse to believe that that is the case.  No doctor has said it hit a brick wall on any particular date.  They all want to say that, yes, early detection always helps, but not in this case.  I just refuse to believe that.  An aggressive condition that this young man had at the time, five days could have been - - could have been the difference between life and death.

For loss of enjoyment of life, the trial court awarded $50,000.00, stating:

> Loss of enjoyment of life, five days in a young man's life.  Of course, I have to be practical here.  If, in fact, Dr. Rodgers had ordered the X ray - - no one argues that the tumor would not have been discovered.  It might have meant just five more days of treatment. . . .
>
> It might have been just ten more days of misery for this young man.  Maybe somebody should be rewarded for that because he didn't suffer.  He got to live like a normal kid for five more days; but then maybe his life would have been extended a little bit, too.

The trial court also awarded $8,569.00 in funeral expenses and signed

his final judgment on June 15, 2018.

---

[2]Dr. Richert, who like Dr. Rodgers was at all pertinent times an employee of the Center, was not personally named at the Medical Review Panel and so was not a party defendant in this suit.

## III.

## <u>STANDARD OF REVIEW</u>

An appellate court reviews a trial court's factual findings under the manifest error standard. *Andrews v. Williams*, 281 So.2d 120 (La.1973). In accordance with this standard:

> [A] court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous—clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues *de novo*.

> When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

6

*Rosell v. ESCO*, 549 So.2d 840, 844-45 (La.1989) (citations and footnotes omitted).

"In the assessment of damages in cases of offenses, . . . much discretion must be left to the judge or jury." La.Civ.Code art. 2324.1. "As a determination of fact, a judge's or jury's assessment of quantum, or the appropriate amount of damages, is one entitled to great deference on review." *Menard v. Lafayette Ins. Co.*, 09-1869, p. 14 (La. 3/16/10), 31 So.3d 996, 1007. "Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review." *Guillory v. Lee*, 09-75, p. 14 (La. 6/26/09), 16 So.3d 1104, 1117.

IV.

## LAW AND DISCUSSION

As the parties do not dispute or challenge the trial court's finding that Dr. Rodgers breached the applicable standard of care, the primary issues before this court are (1) whether a lost chance of survival was proven and/or quantified; and (2) whether the trial court's award for loss of enjoyment of life damages was duplicative. We will address each issue in turn.

### *Loss Chance of Survival*

As is well established, medical malpractice plaintiffs to succeed in their actions must, by a preponderance of the evidence, prove: (1) the applicable standard of care; (2) the physician's breach of that standard; and (3) a causal link between the resulting injury and the breach. La.R.S. 9:2794(A). A loss chance of survival action allows a medical malpractice plaintiff to recover for the reduction of the patient's chance of survival when the physician's malpractice may not have been the only cause of the patient's death, but it increased the risk. *Hastings v. Baton Rouge Gen.*

*Hosp.*, 498 So.2d 713 (La.1986). "Under this theory of recovery, a plaintiff may carry his burden of proof by showing that the defendant's negligence was a substantial factor in depriving the patient of some chance of life, recovery, or, as in this case, a better outcome." *Burchfield v. Wright*, 17-1488, p. 11 (La. 6/27/18), 275 So.3d 855, 863.

Our supreme court in the seminal case of *Smith v. State of Louisiana, Department of Health and Hospitals*, 95-38, p. 6 (La. 6/25/96), 676 So.2d 543, 546-47 (footnotes omitted), recognized that the loss of *any* chance of survival is compensable and discussed the proof necessary to establish same:

> plaintiffs were not required to prove a "reasonable" or "substantial" chance of survival. The issues in loss of a chance of survival cases are whether the tort victim lost *any* chance of survival because of the defendant's negligence and the value of that loss. The question of degree may be pertinent to the issue of whether the defendant's negligence caused or contributed to the loss, but such a tort-caused loss in *any* degree is compensable in damages.
>
> . . . .
>
> Thus, in a medical malpractice case seeking damages for the loss of a less-than-even chance of survival because of negligent treatment of a pre-existing condition, the plaintiff must prove by a preponderance of the evidence that the tort victim had a chance of survival at the time of the professional negligence and that the tortfeasor's action or inaction deprived the victim of all or part of that chance, and must further prove the value of the lost chance, which is the only item of damages at issue in such a case.

In reviewing the trial court's finding as to Anthony's lost chance of survival, we must first determine whether there is any factual basis, based on the record as a whole, for this factual conclusion.

Defendants argue that there was no evidence of a lost chance of survival and that the trial court erroneously rejected the testimony of all the witnesses and substituted its own opinion. Specifically, they argue that there was no lost chance proven between August 10, 2010 and August 15, 2010, and no evidence of what that lost chance of survival would be.

The PCF similarly argues that no evidence was presented that showed the failure to diagnose the inoperable cancer on August 10, 2010, and the ensuing five-day delay to August 15, 2010, lessened the chance of survival. Rather, the PCF asserts that the evidence demonstrated that the cancer had already metastasized to stage IV on August 10 and remained so on August 15, at which point the tumor was too large to be removed. Therefore, a speedier diagnosis would not have made a difference, and it follows that when a decedent's condition is inoperable on the date of negligence, causation for any lost chance of survival cannot be established.

Plaintiff argues, however, that Dr. Michael Weiner, an expert in pediatric hematology-oncology, testified that a delay in diagnosis removed the high likelihood of Anthony's successful treatment. The failure to properly diagnose significantly reduced the chance of survival from July 13, 2010 to August 15, 2010, from 70-80% to 20-30%. Moreover, he testified that it was logical to assume that the rapid change that can occur in tumor growth in one-month time would certainly have impacted the outcome in Anthony's survival rate.

After reviewing the entirety of the record evidence in accordance with the guidance provided in *Smith*, we find a reasonable factual basis does exist for the trial court's finding that Dr. Rodgers's malpractice deprived Anthony of a chance of survival.

Our review of the evidence reveals that the consensus of the expert testimony establishes that Ewing sarcoma is a fast-growing, aggressive bone cancer that is not common. According to Anthony's treating pediatric hematologist-oncologist, Dr. Rajasekharan Warrier, Ewing sarcoma is even less common in an African-American child Anthony's age with an axial (anterior mid-chest) presentation.

Although all the experts did concede that earlier diagnosis is preferable for overall outcome, the experts, as well as the peer review literature, had contradictory opinions as to whether earlier diagnosis statistically made a difference as to survival in this particular type of cancer. Dr. Weiner opined that it did, while Dr. Renee Gardner, Defendants' expert in pediatric hematology-oncology, opined that it did not. The key factors for treatment as well as prognosis were the primary site of the cancer, whether the cancer was contained or localized to that site, and whether the cancer had spread or metastasized.

Localized tumors in resectable sites, such as in lower extremities that could be amputated or bones that could be easily removed, had the highest survival rate of 70 to 80%, as per Dr. Weiner, or 65 to 75%, per Dr. Gardner. The survival rate dropped to 20 to 30% with metastasis. Dr. Warrier testified that the treatment protocol was standardized with resection, i.e., complete removal, if at all possible. Chemotherapy is utilized in an effort to shrink the tumor to allow for resection. Chemo and radiation therapy are employed, with the overall goal to kill the cancer cells and prevent further growth and metastases.

What is clear from the expert testimony and evidence is that the size, location, and stage of Anthony's cancer would be the determining factors as to his chance of survival. The problem herein is that, as Dr. Weiner, Dr. Gardner, and Dr.

Warrier all opined, without x-rays or scans there is no way anyone could even say what stage or size his tumor was either at the July 13, 2010 visit or the August 10, 2010 visit. Most of the experts agreed that the tumor was probably localized at the time of the July 13 visit but had most likely metastasized by the August 10 visit given the metastasis evident in the August 15 scans.

Nevertheless, the evidence does reasonably support a finding that the tumor was fast-growing and aggressive, more probably than not advancing from an early localized stage (I or II) to a metastasized stage (IV) within mere weeks or days, such that every week could very well reduce the chance of survival. And though the tumor was not resectable on August 15, Dr. Weiner opined that the tumor would have been easily resectable with the removal of Anthony's third, right rib bone in an earlier, localized stage. Moreover, Dr. Gardner testified that the mass would probably have been present on August 10, but when asked by Plaintiff's counsel whether she thought the tumor could have grown to the size documented in the August 15 scan in just five days, she replied, "And to be honest with you, yes, I have seen tumors that grow that big that quickly."

Further, the objective medical records, as well as Dr. Rodgers's testimony, reveal that Dr. Rodgers's examination of Anthony's chest on August 10 was normal, documenting no respiratory distress or abnormal breathing sounds. According to the testimony of Plaintiff and Anthony's grandmother, Laura Lambert, Anthony's condition changed on August 15. Plaintiff explained that Anthony's pain "got worse and he couldn't take it anymore." They both recalled that his crying on August 15 was "a different cry. It [was] a hurt cry." It was their testimony that his "hold[ing] of his chest the whole night and the crying getting worse" prompted them

11

to bring Anthony to the ER. And when Anthony was examined in the ER, his chest was tender to the touch as documented in the medical records.

From the evidence of record, we also know that a tumor like Anthony's, although fast-growing, does take time to metastasize. Dr. Gardner agreed that, in order to spread, cancer cells have to be able to break away from the original tumor and move into the bloodstream, lymphatic system, or other surrounding tissue.

In light of this record evidence, we find it is reasonable to conclude that the tumor, though more likely than not present on July 13 and August 10, was more probably than not still growing beyond the latter date. We further find that a factfinder could reasonably conclude that the subsequent growth, reasonably evidenced in Anthony's physical presentation on August 15 as opposed to his presentation on August 10 as documented in the objective medical records, did reduce his chance of survival. Accordingly, we cannot say the trial court manifestly erred in finding that Anthony lost a chance of survival between the August 10 malpractice and the August 15 preliminary diagnosis.

As to the valuation of that lost chance of survival, the supreme court in *Burchfield*, 275 So.3d at 863-64 (first, third, and fourth alterations in original), recently explained:

> Regarding the calculation of damages and the nature of such damages in a loss of chance of survival case, this court in *Smith* specifically instructed "the factfinder— judge or jury—to focus on the chance of survival lost on account of malpractice as a distinct compensable injury and to value the lost chance as a lump sum award based on all the evidence in the record, as is done for any other item of general damages." *Smith*, p. 7, 676 So.2d at 547. The *Smith* court held that "full recovery is not available for deprivation of a chance of survival of less than fifty percent." *Id.* The *Smith* court explained that "[t]o allow full recovery would ignore the claimants' inability to prove by a preponderance of the evidence that the

malpractice victim would have survived but for the malpractice, which is a requirement for full recovery." *Id*., 7–8, 676 So.2d at 547. The loss of a less-than-even chance of survival is "a distinct injury compensable as general damages" that cannot be calculated with mathematical certainty; thus, the factfinder must make a "subjective determination of the value of that loss, fixing the amount of money that would adequately compensate the claimants for that particular cognizable loss." *Id*., p. 9, 676 So.2d at 548. The jury must consider "the same evidence considered by a jury in a survival and wrongful death action, and the loss-of-chance jury then reaches its general damages award for that loss on that evidence as well as other relevant evidence in the record." *Id*., p. 11, 676 So.2d at 549. The jury may consider "all the evidence, including expert medical testimony regarding the percentage chances of survival, to value directly the lost chance." *Id*.

We, like the *Smith* court before us, "[r]ecogniz[e] the unfairness to tort victims who had a chance of [survival] and lost it because of [medical] malpractice," in that the factfinder "must engage in a pretend exercise of measuring damages based on events that never in reality occurred or can occur." *Smith*, 676 So.2d at 548, n. 9. Nevertheless, in accordance with the directive in *Smith*, we have reviewed the percentages testified to by the medical experts regarding the survival rates for children with Ewing sarcoma, particularly from the early, localized stages (I or II) of 70-80% to the metastasized stage (IV) of 20-30%. Without scans documenting the exact growth within the relevant five-day period, a factfinder could, based upon the objective medical records and Anthony's subsequent presentation, reasonably find that the cancer advanced in stages within that limited time period, limiting his chance of survival anywhere from 70 to 20%.

The losses, especially of love, affection, and companionship, incurred as a result of that lost chance of survival are more than reasonably evident in the testimony, particularly the testimony of Plaintiff and her mother. Anthony's pain

and suffering along with the change in his overall quality and enjoyment of life are likewise documented through their testimony to which the medical records lend even further support. Given that Plaintiff requested a total award of $1,508,569.00 in compensation for these losses, we cannot say the trial court abused its vast discretion in awarding a total of $258,569.00, which is less than 20% of the sum requested.

### *Duplication of Damages*

As to the duplicative nature of the loss of enjoyment of life award, we again look to the record. Although parties appeal judgments and not reasons for judgment, the trial judge's oral ruling herein provides insight to this court as to his factual findings regarding his quantum awards. In that ruling, the trial court responded in the affirmative when asked whether the loss chance of survival damages "replace[d] the wrongful death claim" and the damages awardable in conjunction therewith, i.e., the damages sustained by Anthony's mother as a result of the malpractice. *See* La.Civ.Code art. 2315.2. Loss of enjoyment of life, the trial court further explained, was awarded as survival damages, i.e., the damages for injuries to Anthony resulting from the malpractice. *See* La.Civ.Code art. 2315.1.

Although Defendants argue that the lost chance of survival award and loss of enjoyment of life award compensate for the same injury, their argument disregards the fact that both Plaintiff and Anthony suffered injuries and losses arising from the malpractice and are separate tort victims, to whom compensatory damages are due under La.Civ.Code art. 2315. It follows, therefore, that the $50,000.00 awarded for loss of enjoyment of life was intended to compensate Anthony for his loss of enjoyment of life, whereas the $200,000.00 award was intended to

14

compensate Anthony's mother for the damages she sustained, which would include the loss of love, affection, and companionship.[3]

The PCF also challenges the trial court's award of funeral expenses. Recently, however, our supreme court in *Burchfield*, 275 So.2d at 868, again reaffirmed that a factfinder "could consider all factors of damages in fashioning a lump sum award for lost chance," including general as well as special damages, like funeral expenses. Under the *Smith* methodology, all the various items or elements of compensatory damages—loss of enjoyment of life; loss of love, affection, and companionship; and incurred expenses—can and even should be taken into consideration in the formulation of a single lump sum award. All the individual elements of damages suffered by the various tort victims arising from the malpractice are, therefore, to be considered and apportioned for, but then lumped together to form a single lump sum award.

Based upon the present record, we cannot say that the awards for loss of enjoyment of life and funeral expenses are duplicative in that all of the trial court's awards compensate for separate and independent damages, which are more than reasonably supported by the record. However, we do find that the trial court erred in failing to compile all these separate items of damages into a single lump sum award as per *Smith* and its progeny. Therefore, we must amend the trial court's judgment to consolidate its awards into a single lump sum of 258,569.00.[4]

_____

[3]Notably, under the holding in *McGee v. A C And S, Inc.*, 05-1036 (La. 7/10/06), 933 So.2d 770, Plaintiff could only assert Anthony's loss of enjoyment of life under the survival action as he was the primary tort victim. Loss of enjoyment of life "is not recoverable by the primary tort victim's family members who are eligible to recover for loss of consortium, service and society under La. C.C. art. 2315(B)." *Id*. at 779.

[4]In *Bianchi v. Kufoy*, 10-607 (La.App. 3 Cir. 12/8/10), 53 So.3d 530, this court awarded special damages of $100,000.00 in past and future medical care and related expenses and awarded $300,000.00 in general damages to the primary tort victim and loss of consortium damages to his

Having found no manifest error or abuse of discretion, we affirm the judgment of the trial court as amended.

V.

**CONCLUSION**

For the foregoing reasons, the judgment of the trial court is affirmed as amended to reflect a single lump sum award of $258,569.00.

Costs of this appeal are assessed to Defendants/Appellants, Dr. Alycia Rodgers, Sulphur Pediatric Clinic, Inc. d/b/a The Pediatric Center of Southwest Louisiana, and Louisiana Medical Mutual Insurance Company.

**AFFIRMED AS AMENDED.**

---

wife. This court then awarded $400,000.00 as a "lump sum" inclusive of these special and general damages. While the supreme court in *Burchfield*, 275 So.3d at 867, n. 5, disapproved of *Bianchi* to the extent that it "may be interpreted contrary to our holdings in *Smith* and *Graham* [*v. Willis-Knighton Medical Center*, 97-188 (La. 9/9/97), 699 So.2d 365,]" the court did not find fault with this court's "lump sum" award or our compilation of same.

NUMBER 19-10

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

LINDSEY LAMBERT MALBROUGH

VERSUS

ALICIA RODGERS, M.D., ET AL.

CONERY, J., dissenting.

Plaintiff filed this medical malpractice matter alleging that the defendant pediatrician, Dr. Alicia Rodgers, failed to order diagnostic testing for her son, Anthony, that could have earlier revealed Ewing's Sarcoma, the malignant cancer that resulted in his death, thus causing a legally compensable loss of chance of survival. A Medical Review Panel was convened and ruled in favor of Dr. Rodgers. Plaintiff pursued her suit in the Fourteenth Judicial District Court claiming damages for failing to timely diagnose her son resulting in a loss of chance of survival. Following a bench trial, the trial court determined Dr. Rodgers, one of the child's treating pediatricians, breached the standard of care in failing to pursue further testing at a visit five (5) days prior to the child's eventual diagnosis. The trial court awarded damages for the survival action and loss of chance of survival claims as well as funeral and burial expenses.

The defendants question that ruling, arguing that Plaintiff failed to prove causation and the damage awards were erroneous. The majority opinion affirms the judgment of the trial court. I respectfully dissent as I do not find that the record offers a sufficient evidentiary basis for the trial court's determination that Plaintiff

satisfied her burden of proving causation of a lost chance of survival and of the damages awarded. I would find manifest error and reverse.

After rejecting Plaintiff's claim that Dr. Rodgers' partner, Dr. Richert, deviated from the standard of care during an office examination of the child on July 13, 2010, the trial court addressed Dr. Rodgers' examination on August 10, 2010. The medical records reveal that when young Anthony saw Dr. Rodgers on August 10, he had complaints of ADHD and asthma. Dr. Rodgers noted a symptom of "Chest Pain (sometimes)" and reported as "social history" that Anthony's asthma seemed to have worsened after moving into a new apartment four months earlier. Dr. Rodgers did not order a chest x-ray. The trial court rejected the Medical Review Panel's opinion that the medical records clearly revealed "complaints of chest pain that were infrequent, intermittent and not progressive. This precluded the necessity of a chest x-ray as part of the diagnostic evaluation of these complaints." The Medical Review Panel found that Dr. Rodgers did not deviate from the standard of care under these circumstances.

The record shows that a chest x-ray was performed when Plaintiff brought the child to the emergency room on August 15, five (5) days after Dr. Rodgers' examination of August 10. An x-ray showed a tumor which was eventually diagnosed as Ewing's Sarcoma. Anthony tragically passed away a short time later on March 21, 2011. Plaintiff claims that if only Dr. Rodgers had ordered an x-ray on August 10, it would have shown the tumor. Her failure to do so, Plaintiff argues, caused Anthony's loss of chance of survival. The trial court agreed and found a breach of the standard of care in the failure of Dr. Rodgers to order a chest x-ray and to render further care at Anthony's visit on August 10, 2010.

I find that this compassionate trial judge substituted his own views and inferences from the evidence, rather than base his opinion on expert medical testimony as required by the Medical Malpractice Act and the jurisprudence. Consider the wording of the trial judge's findings and ruling:

> Now, the court moves onto August 10th, 2010. As it related to Dr. Rodgers, a little different situation, I believe. I believe that Dr. Rodgers had a little more information than Dr. Richert had. The doctors that were asked to render opinions regarding Dr. Rodgers's visit that day - - I'm still trying to understand exactly that - - they state that if there is infrequent, inter[mitten], or not progressive, then it doesn't necessarily call for anything more than what was performed by Dr. Rodgers on that date. But even in their attempts to explain to me that - - the fact that this was the second time within a 30-day period this patient had been there for what appeared to be continuing chest pains and acknowledge from the first visit of those two with Dr. Richert that it was worsening, **I just believe that something more could have been done at that time.**
>
> . . . .
>
> All of that being said**, I believe Dr. Rodgers made a mistake** on August 10th. To be sure, the fact that it was discerned, or brought out, that Dr. Rodgers had other complaints filed against her is not something taken into consideration. I believe Dr. Rodgers is a fine pediatrician. Very unfortunate these things happen. It is not an indictment on her abilities or whether or not I would take my child to her. In all other purposes, I would suggest that she's probably very thorough. I'm afraid this is one that she missed.

(Emphasis added.)

Not only did the trial court fail to identify a proper evidentiary basis in the record for finding a loss chance of survival, but instead only briefly touched on that element in its award of damages, stating that:

> **What is the chance of survival for a 6-year-old child valued at. I know that there was extensive testimony by physicians for the defense that indicate that the chance of survival was no different on August 15th as it was on August 10th. I refuse to believe that that is the case. No doctor has said it hit a brick wall on any particular date. They all want to say that, yes, early detection always helps, but not in this case. I just refuse to believe that. An aggressive**

**condition that this young man had at the time, five days could have been – could have been the difference between life and death.**

The trial court's conclusion reflects the overall speculative nature of his findings and amounts to a complete rejection of the expert testimony, all of which establishes that the five (5) day delay in discovery of the young child's tumor from Dr. Rodgers' August 10, 2010 visit until the emergency room visit of August 15, 2010, when the tumor was discovered on x-ray, did not contribute to a loss chance of survival. The trial judge did not identify any reasons for his rejection of all the uncontradicted expert testimony and did not explain how and on what evidentiary basis Plaintiff met her burden of proving causation. Exhaustive review of the record fails to show any proper evidentiary basis in the record for such a finding.

A plaintiff in a medical malpractice case involving a claim for a loss chance of survival must *prove* that "the decedent had a chance of survival or recovery that was denied him as a result of the defendant's negligence." *Burchfield v. Wright*, 17-1488, p. 11 (La. 6/27/18), 275 So.3d 855, 863. In her appellee's brief, the plaintiff observes that Dr. Michael Weiner, Plaintiff's own expert in the field of pediatric hematology-oncology and pediatrics, testified as to the aggressive nature of Ewing's Sarcoma and that, on July 13, 2010, when Anthony first saw Dr. Richert, the tumor, presuming that it was local in nature, was associated with a 70-80 percent survival rate. But by the time of the tumor's identification on August 15, 2010, the tumor was metastatic, representing an estimated survival rate of only 20-30 percent.

Plaintiff acknowledges Defendants' contention that no evidence was introduced for the proposition that the chance of survival was reduced to 20-30 percent between August 10, the pertinent date of Dr. Rodgers' examination, and August 15, 2010, the date on which the tumor was identified. Plaintiff contends,

4

however, and the majority agrees, that Dr. Weiner's testimony is sufficient to permit **an inference** that, due to the aggressive nature of the cancer "that a **rapid change** can occur in a five (5) day period." (Emphasis added.) Dr. Weiner's opinion, Plaintiff suggests, provides a rational and reasonable basis for the trial judge's finding that Anthony "sustained a loss of chance of survival and that an award of damages was appropriate," as jurisprudence permits recovery of a loss of chance of survival of any degree. *See Smith v. State, Dep't of Health & Hosps.*, 95-38 (La. 6/25/96), 676 So.2d 543.

In general terms, Plaintiff accurately reports Dr. Weiner's testimony regarding the aggressive nature of Ewing's Sarcoma and the drastic reduction in the chance of survival **at the point of metastasis**. However, the trial court found a breach of the standard of care at the time of the August 10 visit with Dr. Rodgers, not the July 13 visit with her colleague, Dr. Richert. Dr. Weiner, Plaintiff's own expert, testified that by the August 10 visit with Dr. Rodgers, **metastasis had already occurred**. He explained on questioning that:

> Q     Is it more probable than not that the deviation from the standard of care that Dr. Rodgers and the Southwest Pediatric Center committed by failing to obtain an x-ray as early as July 10th - - July 13, 2010, delayed Anthony's diagnosis of Ewing's sarcoma?
>
> A     It is more probabl[e] than not that the failure to obtain the chest x-ray led to the delay in diagnosis of the Ewing sarcoma.
>
> Q     And when you say, "They," you're referring to Dr. Rodgers and Dr. Richert; is that correct?
>
> A     That is correct.
>
> Q     And that would be for the dates of July 13, 2010, as well as August 10, 2010; is that correct?
>
> A     I would qualify that slightly. **I think by August 10, of 2010, that four to five-week time period from July 13 to August 10, I believe the tumor back in August probably would have been**

5

**metastatic, a larger tumor, unresectable. So I don't think that what you're stating is entirely right.**

(Emphasis added.)

At most, Plaintiff's expert testimony generally addressed a decrease in the chance of survival had it been discovered at the *July* exam with Dr. Richert. It squarely contradicts a finding of loss of chance of survival at the time of the subject *August 10, 2010* examination by Dr. Rodgers. Dr. Weiner instead specifically described the tumor as "metastatic" and "unresectable" by that time.

Additionally, the defendants' experts testified that by the time of the August 10, 2010 visit with Dr. Rodgers, the tumor had metastasized. Dr. Warrier was the pediatric oncologist who diagnosed and treated Anthony and was accepted as an expert in both pediatric hematology-oncology and pediatrics. He testified regarding the potential result even if Dr. Rodgers had ordered an x-ray and found the tumor on August 10:

> A     Sure. Let me put it this way, my basic conclusion is if this child was seen a month ago with the same kind of lesion in the lung and the bones and soft tissue, it would not have changed the outcome at all. It would have been the same. If it could not [sic] have been caught earlier, it might have changed the - - but the location, the age, his prognosis is very poor as it is. So I am not sure that a delay of one month in diagnosis made a big difference in what happened; does that make sense?
>
> Q     Yes.
>
> A     My final conclusion after looking at the patient, seeing him, looking at his x-ray when he came from July 10th to August 10th or **August 10th to August 16th would not have made any difference at all in the outcome because his tumor was fairly large, involving the pleura and the lung**. . . .

(Emphasis added.)

While Dr. Warrier explained that an earlier diagnosis of a tumor improves a patient's outcome, he clarified that: "In this particular case, I can't say with

6

confidence if it was one month ago and say for sure it would have been better." He stated that:

> There's always a likelihood if [Anthony] was seen a month ago, the tumor is small if they caught it early. We don't have no - - we have no proof how big it was, how large it was. I don't think with the Ewing's Sarcoma that makes a big difference at all. That's my opinion.

When asked specifically about Dr. Rodger's examination on August 10, Dr. Warrier explained that an x-ray on that date "would have been positive for sure." However, on questioning specific to loss of chance of survival on Dr. Rodgers' August 10 visit, he conclusively stated:

> Q   Let's assume Dr. Rodgers did indeed have a chest x-ray done on that date [(August 10)] and the Ewing's diagnosis followed. Do you have an opinion on whether Anthony's outcome had that happened, would have been different than it turned out to be?
>
> A   No, not at all. **Five days in the life of a tumor, specifically Ewing's Sarcoma, is not that crucial. It would not change the outcome at all. No.**
>
> Q   And that's without qualification?
>
> A   Without qualification. It was six days, right?
>
> Q   Yep.
>
> A   No. **It would not change the outcome at all as far as the ultimate prognosis is concerned.**

(Emphasis added.)

Dr. Gardner, an expert in the fields of pediatric hematology-oncology and pediatrics, similarly testified regarding the significance of metastases in a patient's outcome. Like Dr. Warrier, Dr. Gardner opined that even if an x-ray had detected the tumor at Dr. Rodgers' visit on August 10, a more "speedy diagnosis" would not have made a difference. She attributed that opinion to the location of the tumor. Dr. Gardner confirmed, as she indicated in her report, that: "I do not think that the

7

physician, Dr. Rodgers, can be faulted in the care of this patient. Nor do I think that a more speedy diagnosis in this child with axial location of his tumor, a poor prognostic indicator in and of itself, would have made a difference."

In short, there is no evidentiary basis in the record for the trial court's speculative determination that: "An aggressive condition that this young man had at the time, five days could have been – could have been the difference between life and death." Significantly, Plaintiff did not offer expert testimony to the contrary and, in fact, the plaintiff's own expert, Dr. Weiner, testified otherwise as set forth above.

Plaintiff suggests that an expert opinion on the issue of causation is unnecessary in this case as Dr. Weiner's testimony provided a basis for the trial court to make "factual inferences" as to causation. The supreme court has explained that:

> [E]xpert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794's requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care, and there is objective evidence, including the testimony of the defendant/physician which demonstrates a breach thereof. Even so, the plaintiff must also demonstrate by a preponderance of the evidence *a causal nexus* between the defendant's fault and the injury alleged.

*Pfiffner v. Correa*, 94-924, pp. 9-10 (La. 10/17/94), 643 So.2d 1228, 1234 (emphasis added).

As in this case, the plaintiff in *Pfiffner* sought to establish "that her husband's death was caused by an unnecessary delay in diagnosis and treatment." *Id*. at 10. The supreme court remarked that, while "[t]here are surely cases in which there are obvious unnecessary delays in treatment which constitute medical malpractice and

8

where causation is evident[,]" the situation presented in *Pfiffner* was not such an exception. *Id.* It explained instead that:

> The causal connection between a patient's death and unreasonable delay vis a vis a neurosurgeon's diagnosis and treatment of a patient in circumstances involving a complex medical condition, however, is simply beyond the province of lay persons to assess. Plaintiff here needed to establish, either through her own experts or the testimony of the defendants or defense experts, that given her husband's medical history and condition, as well as the defendants' clinical and diagnostic findings, [the defendants] breached a specified standard of care (perhaps that under these circumstances, more expeditious treatment was necessary) and that **this breach caused Pfiffner's death or loss of a chance of survival. In the absence of such testimony, and even assuming all other facts favorable to the plaintiff, the decision of the lower courts must be reversed because there is no proof that Pfiffner would have fared any better had [the defendants] seen him any earlier than they did. In fact, the evidence is to the contrary, Mrs. Pfiffner did not meet her burden of establishing that the alleged unreasonable delay in the diagnosis and treatment of Pfiffner contributed, in whole or in part, to her husband's death or loss of a chance of survival.**

*Id*. (Emphasis added.)

It is apparent that the inquiry as to causation in this case is similarly complex. The physicians identified a number of variables underlying a prognosis for Ewing's Sarcoma and the difficulties in early diagnosis. None of the physicians could identify the point of metastasis, a variable repeatedly identified as a critical factor. But all agreed that metastasis had already occurred by the time of Dr. Rodgers' August 10 visit. Additionally, the date of identification and actual diagnosis of the Stage 4 tumor in this case came within five (5) days following the August 10, 2010 examination by Dr. Rodgers, the only date on which Dr. Rodgers was found to have rendered treatment allegedly deviating from the standard of care. The trial judge had found no deviation from the standard of care during Dr. Richert's examination on July 13. Plaintiff did not appeal that ruling. Given the unknown factors, even the experts acknowledged that this is not a case "in which causation is evident."

Expert testimony cannot be said to be unnecessary to the plaintiff's burden of proof. Instead, the trial court's conclusion as to causation of loss chance of survival is contrary to all the expert testimony introduced by the parties and has no evidentiary basis in the record.

**Conclusion**

In short, no expert testified that the five (5) day delay between Dr. Rodgers' last visit and the hospital x-ray showing the tumor made any difference at all in this young man's chance of survival. I am constrained to find that the record simply does not offer a sufficient evidentiary basis for the trial court and majority's determination that Plaintiff satisfied her burden of proving causation of a lost chance of survival and of the damages awarded.

I therefore respectfully dissent.